**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| RYAN ALEXANDER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No. 1:23-cv-01602-TWP-MKK |
| | ) |
| ADONIAH MUKONA Physical Therapist, | ) |
| CRAIG SHUMAN RN, | ) |
| NDIDI OJILE RN, | ) |
| JOHN HEFLIN MD, | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANTS' UNOPPOSED
MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed by Defendants
Craig Shuman, R.N. ("Nurse Shuman") and John Heflin, M.D. ("Dr. Heflin") ( Dkt. 64); and a
Motion for Summary Judgment filed by Defendant Ndidi Ojile, R.N. ("Nurse Ojile") (Dkt. 84).
Plaintiff Ryan Alexander, an inmate incarcerated within the Indiana Department of Corrections
("IDOC") filed this civil rights action alleging the Defendants acted with deliberate indifference
to an infection in his hand. (Dkt. 2). He proceeds on Eighth Amendment deliberate indifference
claims against Doctor Heflin, Nurse Shuman, Nurse Nididi Ojile, and Physical Therapist Adoniah
Mukona ("DPT Mukona"). (Dkt. 15 at 4). Mr. Alexander has not responded to either motion for
summary judgment, and the time to do so has passed. For the reasons that follow, the Defendants'
motions are **granted.**

## I.    SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because
there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

Moreover, "Even where a non-movant fails to respond to a motion for summary judgment, the movant still has to show that summary judgment is proper given the undisputed facts." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (cleaned up).

## II.    <u>FACTUAL BACKGROUND</u>

Mr. Alexander failed to respond to the summary judgment motions. Accordingly, facts alleged in the motion are "admitted without controversy" so long as support for them exists in the record. See S.D. Ind. L.R. 56-1(b) (party opposing judgment must file response brief and identify

disputed facts). In addition, because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Alexander and draws all reasonable inferences his favor. *Khungar*, 985 F.3d at 572–73.

### A.  The parties

Mr.  Alexander is an IDOC inmate who was previously housed at Correctional Industrial Facility ("CIF") where the events that gave rise to this action took place. (Dkt. 2 at 1).

Dr. Heflin is a physician who has been licensed to practice in Indiana since 2007. (Dkt. 65-1 at 1) Dr. Heflin was not involved in scheduling physical therapy ("PT") once it was ordered and likewise was not responsible for scheduling or arranging transportation of inmates for physical therapy sessions. *Id.* at 5. Similarly, Dr. Heflin is not involved in offsite provider scheduling. *Id.* at 6. The scheduling of offsite provider visits is dictated by the offsite provider's availability and the availability of IDOC personnel to transport the patient. *Id.*

Nurse Shuman is a registered nurse. (Dkt. 65-1 at 5). She was not responsible for scheduling or arranging transportation of inmates for physical therapy sessions. *Id.* Likewise, Nurse Shuman was not involved in offsite provider scheduling. *Id.* at 6.

Nurse Ojile became a registered nurse in 2021 and was licensed at the time relevant to the complaint. (Dkt. 84-1 at 1). Nurse Ojile's last day of employment at Pendleton Correctional Facility was December 30, 2022. *Id.*

PT Mukona is a Doctor of Physical Therapy ("DPT") (Dkt. 65-2 at 78-79).

### B.  Mr. Alexander's hand injury

On September 27, 2022, Mr. Alexander was seen at the CIF medical unit after submitting a Health Care Request Form ("HCRF") stating that he was injured playing basketball the previous

day. (Dkt. 65-2 at 72).  An internal investigation revealed that Mr. Alexander got into a physical altercation with another inmate, which was the source of his hand injury. (Dkt. 2 at 7).

### C.  Mr. Alexander's 2022 medical history related to his hand injury

#### a.  September 27 visit with nonparty Nurse Richey

In response to Mr. Alexander's HCRF, he was seen by nonparty Nurse Richey who observed a superficial injury to his right hand that had "increased warmth, increased redness, increased swelling, drainage, increased pain." (Dkt. 65-2 at 73). She assessed a "potential or actual infection" related to "laceration/abrasion." *Id.* Nurse Richey contacted Nurse Practitioner Crawford, who ordered Keflex, an antibiotic, for a period of seven days. *Id.* at 74. Nursing staff also gave Mr. Alexander Tylenol and a bag for ice and instructed him to clean the wound with antibacterial soap several times a day and to report continued signs of infection. *Id.*

#### b.  September 30 chronic care visit

During this chronic care visit, Mr. Alexander's right hand had marked redness and swelling and he had limited range of motion in his fingers. (Dkt. 65-2 at 69-71). Nonparty Nurse Crawford evaluated Alexander and ordered his transfer to the ER. *Id.* at 70-71.

#### c.  September 30 emergency room visit and October 1 surgery

Mr. Alexander was seen by St. Vincent Anderson emergency medicine physician nonparty Dr. Jason Henney. *Id.* at 81. Dr. Henney's notes state that Mr. Alexander had persistent purulent drainage. *Id.* Dr. Henney ordered Unasyn, an antibiotic, and that Mr. Alexander be seen by an orthopedic surgeon. *Id.* at 82. Dr. Henney observed that the MRI of Mr. Alexander's right hand was concerning for "early or developing osteomyelitis" and partial tendon tear at the level of the second metacarpal head. *Id.* at 100-101. Mr. Alexander was evaluated by an orthopedic surgeon and taken to surgery for incision and drainage on October 1. *Id.* at 98. Mr. Alexander was discharged on

October 2 with a discharge diagnosis of "Cellulitis and possible septic arthritis, tenosynovitis of the second digit, right hand." *Id.* at 98-99. A 10-day course of Augmentin, another antibiotic, and follow up with the prison's doctor in the next 2-3 days were recommended. *Id.*

### d. October 3 visit with Dr. Heflin

Dr. Heflin saw Mr. Alexander's hand injury for the first time on October 3. *Id.* at 67. Dr. Heflin observed the "Laceration to dorsal surface of right hand between index and middle fingers is well approximated with sutures. Minimal amount of serous drainage."[1] *Id.* at 68. Dr. Heflin directed Mr. Alexander to finish his course of antibiotics, take Tylenol for pain and see the nurse daily for topical antibiotic and dressing changes until healed. Dkt. 65-2 at 68. Dr. Heflin also planned to remove the sutures on October 7. *Id.*

### e. October 5 visit with Dr. Heflin

Dr. Heflin saw Mr. Alexander on October 5 and examined his hand and observed that "[l]aceration to dorsal surface of right hand between index and middle fingers is well approximated with sutures. Minimal amount of serous drainage." *Id.* at 66, 68. The wound showed no signs of active infection. (Dkt. 65-1 at 2). Given the level of healing observed, Dr. Heflin determined Mr. Alexander's three sutures could be removed. *Id.* Dr. Heflin removed Mr. Alexander's sutures without complication and bandaged the wound with a steri strip, gauze pad, and band aid. (Dkt. 65-2 at 66). Dr. Heflin instructed Mr. Alexander to continue daily nursing visits for dressing change until the wound healed and to continue Augmentin until complete. *Id.*; Dkt. 65-1 at 2.

### f. October 12 dressing change

Mr. Alexander's October 12 dressing change revealed no signs of infection. Dkt. 65-2 at 65.

---

[1] Serous drainage is a clear to yellow fluid that leaks out of a wound. This type of wound drainage is a normal part of the body's healing process and, unlike purulent drainage, is not concerning for active infection. Dkt. 65-1 at 2.

### g. October 13 visit with Nurse Ojile

Mr. Alexander saw Nurse Ojile for a scheduled dressing change. Dkt. 84-1 at 2; *see also* Dkt. 65-2 at 64. Nurse Ojile examined Mr. Alexander's injury and noticed his right hand to be swollen with no visible drainage. Dkt. 84-1 at 2. Nurse Ojile contacted Dr. Heflin who ended up prescribing Amoxicillin 500 mg capsule three times daily for seven days. *Id.* Amoxicillin was an appropriate antibiotic choice to treat a suspected developing infection in the area of Mr. Alexander's surgical incision wound. Dkt. 65-1 at 2-3. Nurse Ojile cleaned Mr. Alexander's wound with normal saline and iodine and applied an antibiotic ointment. Dkt. 84-1 at 2. She also applied a non-adherent pad and wrapped the wound with a dressing under sterile conditions. *Id.* Nurse Ojile educated Mr. Alexander on the importance of complying with the medical protocol, which Mr. Alexander indicated that the understood. *Id.*

### h. October 14, 15, and 16 dressing changes with Nurse Ojile

Mr. Alexander presented for dressing changes on October 14, 15, and 16, 2022; his surgical site remained swollen but had no drainage. (Dkt. 65-2 at 61-63). Nurse Ojile cleaned the incision site with normal saline and iodine, applied antibiotic ointment, placed a non-adherent pad, and wrapped the wound with sterile dressing. (Dkt. 84-1 at 2). Nurse Ojile saw no evidence of active infection, and Mr. Alexander was on oral and topical antibiotics at each of these visits. *Id.* The condition of Mr. Alexander's hand appeared stable, and Nurse Ojile saw no reason to recontact Dr. Heflin. *Id.* After each visit, Mr. Alexander returned to the dormitory in stable condition. *Id.*

### i. October 17 refused dressing change with Nurse Ojile

Mr. Alexander refused his October 17 dressing change and refused to sign the form. (Dkt. 65-2 at 60; Dkt. 84-1 at 2).

### j.   October 18 dressing change with Nurse Shuman

Nurse Shuman saw Mr. Alexander on October 18, changed his dressing, and noted the area was still swollen and excoriated.[2] *Id.* at 59. Nurse Shuman cleaned the area with antiseptic and normal saline rinse and applied antibiotic ointment and a nonstick dressing. *Id.* Mr. Alexander had no complaints and was still taking amoxicillin 500 mg. *Id.* Thus, she felt there was no reason for her to discuss Mr. Alexander's wound healing status with a physician on this date. *Id.*

### k.   October 20 refused dressing change

Mr. Alexander refused his October 20 dressing change stating his wound was "healed up no more need." *Id.* at 105. Nurse Shuman documented Mr. Alexander's refusal.[3] Nurse Shuman encouraged Mr. Alexander to allow wound care/dressing change and instructed him to return for increased swelling or if the wound opened. (Dkt. 65-1 at 3). Nurse Shuman had Mr. Alexander sign a refusal form acknowledging his understanding and agreement with the plan of care. *Id*; Dkt. 65-2 at 58, 105.

### l.   November 4 sick call

Mr. Alexander was seen for sick call on November 4 after complaining he "can't move [his] hand very well since [he] had surgery." Dkt. 65-2 at 57. Nonparty Nurse Peter Moore notified the doctor of potential lingering infection, and the doctor ordered Bactrim BID[4] for seven days. *Id.* If it did not get better, the doctor would order an x-ray. *Id.*

### m.   November 14 x-ray ordered by Dr. Heflin and November 17 radiology interpretation

---

[2] Swelling and excoriation (loss of epidermis) are commonly seen during the wound healing process and are not suggestive of osteomyelitis or other serious infection. (Dkt. 65-1 at 3).

[3] When an inmate refuses dressing change/wound care for a surgical wound, standard of care provides that the patient be encouraged to allow the wound care and be instructed about signs/symptoms that warrant return for evaluation. (Dkt. 65-1 at 3).

[4] Bactrim is an antibiotic used to treat, among other things, wound infection including MRSA. Wound cultures or referral to orthopedic surgeon were not indicated or standard of care under the circumstances. (Dkt. 65-1 at 3-4).

Dr. Heflin ordered Mr. Alexander x-rays of his right hand, which were completed on November 14 and interpreted by nonparty radiologist Robert Mehl on November 17 with an indication of "Trauma, Altercation. Pain second digit." *Id.* at 56, 75. Dr. Mehl's impression was: (1) No acute bony abnormality right hand; (2) Soft tissue swelling proximal index finger; (3) Mild interphalangeal degenerative change. *Id.* Findings on Mr. Alexander's November 14 right hand x-rays of soft tissue swelling of the proximal right index finger and mild interphalangeal degenerative change were consistent with post-traumatic degenerative joint disease ("DJD")[5] aka osteoarthritis. (Dkt. 65-1 at 4).

### n.    November 18 nursing visit

Mr. Alexander was seen by nonparty Nurse Ahmad Alsherman for finger pain and to receive X-ray results. (Dkt. 65-2 at 53). Mr. Alexander complained of fluid in his finger and pain of 7/10. *Id.* Nurse Alsherman noted that Mr. Alexander could not flex or extend his finger, had mild swelling, and referred to the provider for further assessment and decision. *Id.* at 54-55.

### o.    November 22 visit with Dr. Heflin

Dr. Heflin saw Mr. Alexander on November 22 and noted that his right index finger continued to have pain, stiffness, and swelling and that the x-ray revealed "soft tissue swelling but is otherwise ok." *Id.* at 51. Dr. Heflin noted that the flexibility of Mr. Alexander's finger was greatly reduced and that he experienced pain with any range of motion. *Id.* On physical examination, the right index finger showed trace edema[6] without redness. *Id.* at 52. Mr. Heflin's plan was for

---

[5] DJD is a degenerative disease that worsens over time, often resulting in chronic pain. Joint pain and stiffness can become severe enough to make daily tasks difficult. Dkt. 65-1 at 4. Injuries, such as those that occur when playing sports or from an accident, can increase the risk of DJD. *Id.* Post traumatic DJD is progressive and cannot be prevented. *Id.* Treatment and management of post-traumatic DJD typically starts with conservative interventions including pain and/or anti-inflammatory medication, physical therapy, heat and cold therapies which also help relieve pain and stiffness, and lifestyle changes. *Id.* If symptoms are severe and other treatments have not worked, treatment may progress to surgery. *Id.*

[6] Edema can indicate worsening osteoarthritis. The MCP and PIP joints were stiff and with reduced range of motion. Dkt. 65-2 at 52.

ibuprofen for pain and referral to physical therapy ("PT") for assessment. *Id.* Mr. Alexander's symptoms were not severe enough to warrant cultures or a surgical consult. Dkt. 65-1 at 4. Dr. Heflin renewed the ibuprofen 600 prescription through November 28, 2022. Dkt. 65-2 at 52. Dr. Heflin opines that Mr. Alexander's degenerative changes were more likely than not due to trauma sustained to his right hand during an altercation with another inmate with infection requiring hospitalization with IV antibiotics and incision and drainage from September 30 to October 2. Dkt. 65-1 at 6.

### p.  November 28 visit with DPT Mukona

DPT Adoniah Mukona saw Mr. Alexander for physical therapy on November 28. Dkt. 65-2 at 76. During physical therapy, Mr. Alexander reported he suffered a human bite injury during an altercation. *Id.* DPT Mukona noted that the November 17 x-rays showed mild interphalangeal degenerative joint disease. *Id.* DPT Mukona outlined the therapy treatment with Mr. Alexander. *Id.* at 77.

### q.  December 5 physical therapy with DPT Mukona

Mr. Alexander participated in physical therapy with DPT Mukona on December 5. *Id.* at 78-79.

### r.  December 11 did not show up for physical therapy

Mr. Alexander did not show up for his December 11 physical therapy session. *Id.* at 50.

### s.  December 29 sick visit with Nurse Ojile

Mr. Alexander submitted a HCRF stating "I'm having pain in my hand along with not getting PT I wish to see the doctor." *Id.* at 48-49. The last time Nurse Ojile saw Mr. Alexander was on December 29, 2022 where she took his vital signs and referred him to see a physician. Dkt. 84-1 at 3. Nurse Ojile did not detect any evidence of infection at this visit. *Id.*

### D.  Mr. Alexander's 2023 medical history related to his hand injury

#### a.  January 19, 2023 visit with nonparty Nurse Richey

Mr. Alexander saw nonparty Nurse Richey on January 19, 2023, after he submitted a HCRF complaining that his finger was locked up and in pain. Dkt. 65-2 at 46. He reported his stiffness and pain "are starting to get worse" and that he did not get to finish physical therapy due to "housing location/unit lockdown. *Id.* at 47. Nurse Richey gave him Tylenol and planned to refer him to see a provider. *Id.*

#### b.  January 23 physical therapy with DPT Mukona

Mr. Alexander saw DPT Mukona for physical therapy on January 23. *Id.* at 43. Mr. Alexander reported having "no pain without doing something with the right hand. Pain is felt when stretching and doing activities and bad when he bumps on objects." *Id.* at 45. DPT Mukona's notes under history of present illness include that Mr. Alexander's symptoms began four months ago, and his symptoms were moderate but random. *Id.* at 44. Mr. Alexander described his symptoms as a burning sensation. *Id.* DPT Mukona noted the "context of the symptoms include only when stretching extensors." *Id.*

#### c.  January 27 visit with Dr. Heflin

Dr. Heflin saw Mr. Alexander on January 27, who reported his right index finger continued to swell and have pain. *Id.* at 41. Mr. Alexander reported that he "has had a few therapy sessions which are helping." *Id.* Dr. Heflin examined the finger and observed swelling over the Metacarpophalangeal (MCP)[7] joint. *Id.* at 42. Dr. Heflin's assessment was "finger injury" and his provider plan was "Finger continues to be stiff and swollen. Now in physical therapy. Continue

---

[7] MCP is short for Metacarpophalangeal. Dkt. 65-1 at 6.

home exercises. Ibuprofen as needed." *Id.* Mr. Alexander "verbalized an understanding of the plan." *Id.*

### d. February 13 HCRF

Mr. Alexander submitted a HCRF on February 13 that stated "I have been having pain in my hand (right index) I haven't been called out to therapy in a few weeks. I hit my hand recently and I'm in pain and ran out of the Ibuprofen 600mg I was prescribed and it didn't really relieve my pain very well. Please help." *Id.* at 104.

### e. February 15 visit with Nurse Shuman

Mr. Alexander saw Nurse Shuman in response to his HCRF on February 15 and noted that he had been "doing his PT with no improvement, cannot bend his index finger past a certain point. No new injury verbalized." *Id.* at 38. Nurse Shuman referred Mr. Alexander to the provider and instructed hm to request a sick call if his symptoms do not go away or become more severe. *Id.* at 39-40.

### f. February 20 physical therapy with DPT Mukona

On February 20, Mr. Alexander returned to physical therapy with DPT Mukona, who noted: "Patient is making very good progress except he has residual joint tissue contractures limiting full extension and flexion of the right forefinger PIP and DIP joints. He now has a functional hand grip with full strength of 5/5 muscle strength." *Id.* at 35-37.

DPT Mukona observed that Mr. Alexander had increased right PIP joint flexion to 65 degrees actively and 70 degrees passively. *Id.* He had functional good muscle strengthen of 5/5 in right hand. Mr. Alexander's pain score was 0/10. *Id.* DPT Mukona instructed Alexander to continue

with stretching and educated him that "he is the only one who can help improve ROM[8] by stretching effectively." *Id.*

Dr. Heflin also saw Mr. Alexander on February 20 and reported: "Hand pain from traumatic injury continues. Had PT visit this morning. Has been doing stretching exercise which helps. Range of motion is slowly improving. He has aching pain at the base of the index finger worse with flexion." *Id.* at 33. Dr. Heflin's assessment was "laceration of hand" and his provider plan was "Still in PT with minimal improvement in ROM. Continues to have pain and swelling in the MCP joint. Consider MRI of hand once PT complete if ROM still limited." *Id.* at 34.

### g.  February 27 physical therapy with DPT Mukona

Mr. Alexander had physical therapy with DPT Mukona on February 27, who observed that Mr. Alexander was "making good progress" and was able to "make a full functional fist with his right hand." *Id.* at 31. Mr. Alexander stated that he was ready to start working a prison job. *Id.* DPT Mukona noted: "Patient is doing fairly well and has improved right PIP joint flexion to [where] he can [now] make a full fist. He however has lack of extension possible at the PPIP joint use to possible tendon adhesions to the joint capsule." *Id.* at 32. DPT Mukona's plan was: "Will continue to see patient 1-2 more sessions. He [may] start working duties right away." *Id.* DPT Mukona documented that Mr. Alexander had partially met his right forefinger active range of motion goal and met his goal of pain reduction to 0/10. *Id.*

### h.  March 2 HCRF

Mr. Alexander submitted an HCRF on March 2 stating his doctor "was supposed to schedule an MRI and provide give me a KOP of an anti-inflammatory and Ibuprofen 600. I haven't

---

[8] Defendants do not explain this term but the Court surmises it must mean "range of motion."

received the medication in over a week and it causes me to doubt he put in for my MRI at the outside hospital." *Id.* at 103.

Ibuprofen 600 mg is the equivalent of three ibuprofen 200 mg tablets which can be purchased in the commissary. Dkt. 65-1 at 5.  Mr. Alexander purchased ibuprofen 200 mg tablets from the commissary. Dkt. 65-2 at 83. Nursing responded that the doctor "ordered IBU[9] 600 on 3-6-23" and reminded Mr. Alexander that Dr. Heflin's plan was to consider MRI after he finished with physical therapy. *Id.* at 103.

### i.   March 6 physical therapy with DPT Mukona

Mr. Alexander saw DPT Mukona for physical therapy on March 6. *Id.* at 28-30. DPT Mukona documented that Mr. Alexander met all of his therapy goals and was able to be discharged from physical therapy. *Id.* at 29-30.

### j.   March 26 visit with Nurse Shuman

Mr. Alexander submitted a HCRF stating that his hand was not working and was hurting him, and he wanted an MRI and a visit with an offsite specialist. *Id.* at 102. Mr. Alexander was seen on March 26 by Nurse Shuman in response to this HCRF. *Id.* at 25-26, 102. Mr. Alexander expressed to Nurse Shuman that his hand "was better during PT but as soon as it was over it got worse again." *Id.* at 27. He had limited range of motion to the right index finger but verbalized no other complaints. *Id.* at 25-27. Nurse Shuman referred Mr. Alexander to the provider. *Id.* at 26. He also instructed Mr. Alexander to apply ice or cool compresses and heat as needed. *Id.*

### k.   March 28 visit with Dr. Heflin

On March 28, Dr. Heflin saw Mr. Alexander, who reported that he completed PT and had been doing home exercises but continued to have pain in his finger with limited range of motion.

---

[9] Defendants do not define this term, but the Court assumes it is a truncated version of the drug Ibuprofen.

*Id.* at 22. His finger was stiff and swollen. *Id.* Given continued symptoms after completion of physical therapy, Dr. Heflin placed an offsite provider request ("OPR") for an MRI and to start Mr. Alexander on Meloxicam.[10] *Id.* at 23.

### l.  March 29 Dr. Heflin OPR for MRI of right hand

On March 29, Dr. Heflin submitted an OPR for a right-hand MRI given Mr. Alexander's continued reports of pain, stiffness, swelling, and limited range of motion. *Id.* at 21. Dr. Heflin's request for MRI was denied in favor of an alternative treatment plan of starting with an x-ray. *Id.* The reviewer at Centurion also questioned whether Mr. Alexander had residual deficit from the significant infection he had in October 2022. *Id.*

### m.  June 13 visit with Dr. Heflin

Mr. Alexander saw Dr. Heflin again on June 13. *Id.* at 19. Mr. Alexander reported right index finger pain, swelling and decreased range of motion. *Id.* Dr. Heflin examined Mr. Alexander's right finger and observed trace edema at the MCP joint with reduced range of motion. *Id.* at 20. Dr. Heflin ordered a new x-ray *Id.*

### n.  June 15 x-ray interpretation by radiologist Curt Liebman

Curt Liebman interpreted the June 15 x-ray images. *Id.* at 80. Dr. Liebman found: "There is significant abnormality at the 2nd metacarpophalangeal joint with bone loss on both sides the joint space suggesting osteomyelitis. There is no evidence of acute fracture, dislocation or osseous lesion. The joint spaces appear preserved. The adjacent soft tissues appear normal." *Id.* His impression was: "Question osteomyelitis at the 2nd metacarpophalangeal joint." *Id.*

---

[10] Meloxicam is a nonsteroidal anti-inflammatory drug (NSAID) used to relieve inflammation, swelling, stiffness, and joint pain. Dkt. 65-1 at 6.

### o.   June 19 Dr. Heflin submits OPR for orthopedic consultation

On June 19, Dr. Heflin submitted an OPR for orthopedic consultation for "right MCP joint osteomyelitis." *Id.* at 17. Dr. Heflin's request was approved on June 22. *Id.* at 17-18.

### p.   June 30 Eskenazi for orthopedic surgery consultation and MRI

Mr. Alexander was transported to Eskenazi Health for orthopedic surgery consultation and an MRI on June 30. *Id.* at 84-89.

Nonparty orthopedic surgeon Brian Christie documented Mr. Alexander's history of present illness in pertinent part: "[Mr. Alexander] states that an x-ray was taken at this time which did not demonstrate any fracture. He did develop an abscess over this joint that was subsequently drained by a hand surgeon at Saint Francis [sic]. He did complete his course of antibiotics. However he now has persistent stiffness and pain of this joint. He has done some therapy in his facility for this which has been unsuccessful." *Id.* at 84.

Dr. Christie further documented: "[W]e discussed the management of osteomyelitis as well as his degenerative changes in his 2nd MCP joint, including nonoperative versus operative management. Non-operative options would include physical therapy. Operative options would include debridement to clear the osteomyelitis, as well as possibility of MCP joint arthroplasty versus arthrodesis versus index finger amputation." *Id.* at 86. Dr. Christie wanted to see Mr. Alexander for a follow up after the MRI to discuss antibiotic treatment and surgical reconstruction. *Id.* The MRI demonstrated "Age-indeterminate erosive changes about the second metacarpophalangeal joint. No substantial joint effusion however infection should be excluded with monoarticular erosive changes." *Id.* at 88.

### q.  July 7 Dr. Heflin submits OPR for follow up with nonparty Dr. Christie

Dr. Heflin submitted an OPR for Mr. Alexander for a follow up with Dr. Christie on July 7. *Id.* at 16. Dr. Heflin's request was approved on July 13, and on that same day, Dr. Heflin submitted an urgent request for an offsite infectious disease consultation. *Id.* at 15-16, 90. Dr. Heflin noted "MRI shows erosive changes and concern for chronic osteomyelitis." *Id.* at 16.

### r.  July 21 follow up with nonparty Dr. Christie

During Mr. Alexander's July 21 visit with Dr. Christie, he examined Mr. Alexander and recommended "bone biopsy to rule out infection and allow for identification of pathogen prior to insertion of hardware/arthroplasty." *Id.* at 92. Mr. Alexander consented to this plan. *Id.* Dr. Christie's impression was "Erosive arthritis of right index MP traumatic versus infectious etiology." *Id.* at 91. His plan was to do a biopsy of the bone to determine if there was an infection before deciding if surgery was necessary, and to do a follow-up appointment in two weeks. *Id.* at 91-92.

### s.  July 28 Dr. Heflin submits OPR for bone biopsy

Dr. Heflin submitted another OPR request for a bone biopsy, which was approved August 4 and scheduled for September 5. Dkt. 65-2 at 12-14.

### t.  September 1 Dr. Heflin submits OPR for follow up

Dr. Heflin submitted another OPR requesting approval for a follow up appointment for Mr. Alexander to see Dr. Christie after the bone biopsy procedure. *Id.* at 11.

### u.  September 5 bone biopsy

On September 5 the bone biopsy was performed and surgical pathology/cultures had "no growth, no concern for osteomyelitis." *Id.* at 93-94, 97. Dr. Christie diagnosed Mr. Alexander with "Right index finger MP posttraumatic DJD." Dkt. 65-2 at 94.

### v.  September 20 visit with nonparty Dr. Christie

Mr. Alexander saw Dr. Christie on September 20 and discussed the pathology results and his treatment recommendation for "right index finger metatarsophalangeal joint arthroplasty." [11] (Dkt. 65-2 at 94).

### w.  September 27 Dr. Heflin submits OPR for arthroplasty

On September 28, Dr. Heflin submitted an OPR for right index finger arthroplasty, which was approved. *Id.* at 93.

### x.  November 21 surgery with Dr. Christie

On November 21, Mr. Alexander underwent right index finger metacarpophalangeal silicone arthroplasty performed by Dr. Christie. *Id.* at 95-96. Dr. Christie's indication for surgery was that Mr. Alexander

> sustained trauma to the right index finger MP joint. This was initially concerning for infection and possible osteomyelitis. However, he underwent a bone biopsy, extensive antibiotics and MRI, all of which effectively ruled out any further ongoing infection. We therefore discussed definitive treatment for his painful arthritic joint. Ultimately, the risks, benefits, and alternatives to right index finger silicone arthroplasty of the MP joint were discussed including the risks of bleeding, infection, damage to surrounding structures, need for further surgery, stiffness, pain, hardware fracture, hardware dislocation, and need for revision surgery. After full discussion was had, written informed consent was obtained.

*Id.*

During surgery, Dr. Christie encountered a "significant amount of scar tissue." *Id.* at 96. There were no intraoperative complications. *Id.* Dr. Christie's pre-operative and postoperative diagnosis was "right index finger posttraumatic arthritis of the metacarpophalangeal joint." *Id.* at 95.

---

[11] Metacarpophalangeal (MCP) joint arthroplasty (aka joint replacement) is a surgical procedure to replace damaged or diseased MCP joints. Dkt. 65-1 at 6. The procedure involves removing the damaged joint and replacing it with an artificial implant. *Id.*

### y.  December 8 visit with Dr. Heflin

Mr. Alexander saw Dr. Heflin on December 8 and noted that his chronic pain and stiffness persisted. *Id.* at 8-10. Dr. Heflin prescribed Diclofemac 1% topical gel which is a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild-to-moderate pain, and helps to relieve symptoms of osteoarthritis, such as inflammation, swelling, stiffness, and joint pain. Dkt. 65-1 at 6.

### E.  Mr. Alexander's 2024 medical history related to his hand injury

### a.  January 4 physical therapy visit with PT Scott Gull

Mr. Alexander saw nonparty PT Scott Gull on January 4, 2024, and reported his symptoms were "mild" and his "pain is good." Dkt. 65-1 at 6. PT Gull encouraged Mr. Alexander to continue to work on active DIP and PIP joint extension. *Id.*

### b.  January 16 physical therapy complete

Mr. Alexander met his physical therapy goals by January 16, 2024. *Id.* at 3-4.

## III.  <u>DISCUSSION</u>

In his verified Complaint, Mr. Alexander generally alleged that medical staff ignored his complaints of pain and the continued swelling of his hand. *See* Dkt. 2; *see also* Dkt. 15 at 2. He avers that he submitted numerous HCRFs seeking treatment for his hand and the pain caused by the infection. (Dkt. 2, Dkt. 15 at 2). Mr. Alexander alleged that Defendants failed to provide adequate treatment and pain management in response. *Id.* at 3. Mr. Alexander continued to suffer severe pain throughout his hand and believed he may lose his fingers if he did not receive surgery soon.[12] *Id.*

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to

---

[12] Mr. Alexander's Complaint was filed on September 6, 2023, several months before he underwent joint replacement surgery.

incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

"Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted).

The Seventh Circuit has held that deliberate indifference occurs when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Id.*

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

The Court assumes for purposes of the summary judgment motion that Mr. Alexander's hand injury was objectively serious. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that Defendants acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Mr. Alexander]'s health." *Dean v. Wexford Health*

19

*Sources, Inc*., 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up). Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Rather, Mr. Alexander "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728.

### A.  Dr. Heflin

Dr. Heflin argues on summary judgment that the evidence does not support a deliberate indifference claim. Dkt. 66 at 23. The Court agrees. The evidentiary record before the Court demonstrates that Dr. Heflin provided comprehensive care and was diligent in treating Mr. Alexander's hand injury by prescribing medication to ward off infection, ordering x-rays, referring him to physical therapy, and submitting OPRs for an MRI, orthopedic consultation, for follow up with Dr. Christie, for a bone biopsy, and for right index finger arthroplasty. Dkt. 65-2 at 11-14, 17-21, 52, 56, 68, 75, 90, 93. Dr. Heflin was heavily involved in Mr. Alexander's ongoing treatment for his hand injury, including during provider visits when he removed sutures, observed healing for signs of infection and inflammation, examined finger mobility, prescribed pain management, and implemented an extensive treatment plan. *Id.* at 8-10, 19-20, 22-23, 41-42, 52, 66-68.

To the extent that Mr. Alexander complains that he was not able to complete all of his physical therapy, Dkt. 2, Mr. Alexander has presented no evidence to suggest that Dr. Heflin is to blame. Rather, the evidence illustrates that, after the initial referral to physical therapy, Dr. Heflin was not involved in scheduling or arranging transportation of inmates for physical therapy sessions. Dkt. 65-1 at 5.

Mr. Alexander's medical records reflect that Dr. Heflin's assessment and treatment plan was based on medical judgment. Dkt. 65-2. Where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would

20

have handled the situation differently. *Dean*, 18 F.4th at 241-42. Dr. Heflin thoroughly investigated Mr. Alexander's complaints, and referred him to physical therapy and to an offsite provider to get to the bottom of Mr. Alexander's ongoing finger pain. Dkt. 65-2 at 22-23, 62. In doing so, Dr. Heflin closely followed the advice of specialist Dr. Christie. *Id.* at 11-18, 90-93. While medical providers can be deliberately indifferent if they decline to follow the advice of a specialist, *see, e.g. Petties*, 836 F.3d at 729, it is clear Dr. Heflin deferred to the judgment of Dr. Christie in treating Mr. Alexander from June through December 2023. Dkt. 65-2 at 8-18, 90-93.

No reasonable jury would conclude that Dr. Heflin's approach to Mr. Alexander's hand injury evinced deliberate indifference. Dr. Heflin prescribed drugs to curb infection and inflammation and closely observed changes in Mr. Alexander's wound, which dictated his course of treatment. 8-10, 19-20, 22-23, 41-42, 52, 66-68. Dr. Heflin's conservative approach, guided by his medical judgment, does not "approach[ ] intentional wrongdoing" as to show deliberate indifference. *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020) (internal citation and quotation marks omitted).

In failing to respond to summary judgment, Mr. Alexander has not designated any evidence from which a reasonable jury could infer that this course of treatment was "so far afield of accepted professional standards that a jury could find it was not the product of medical judgment." *Cesal v. Moats*, 851 F.3d 714, 724 (7th Cir. 2017) (cleaned up). Instead, Mr. Alexander's complaint only generally disagrees with the medical treatment he received. Dkt. 2. But disagreement with a physician's chosen course of medical treatment alone is insufficient to establish a claim of deliberate indifference. *Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021).

Given the totality of Dr. Heflin's treatment decisions for Mr. Alexander's injury to his right index finger, no reasonable jury could conclude that his actions evinced deliberate indifference. Accordingly, Dr. Heflin is entitled to summary judgment.

### B. Nurse Shuman

Nurse Shuman argues on summary judgment that there is no evidence of deliberate indifference on his behalf, so he is entitled to summary judgment in his favor. Dkt. 66 at 23.

Mr. Alexander first saw Nurse Shuman on October 18, 2022, for a dressing change where he documented that the surgical wound area was swollen and excoriated, but Mr. Alexander was already on a course of antibiotics. Dkt. 65-2 at 59. Accordingly, Nurse Shuman did not find it necessary to contact the provider at that time and cleaned the wound and applied antibiotic ointment and a new dressing. *Id.* Mr. Alexander saw Nurse Shuman again on October 20 for a dressing change, but Mr. Alexander refused the dressing change and signed a refusal form. *Id.* at 105; *see also* Dkt. 65-1 at 3. Nevertheless, Nurse Shuman encouraged Mr. Alexander to allow him to complete the dressing change and to seek medical attention if the wound opened or his swelling increased. *Id*; Dkt. 65-2 at 58, 105.

Mr. Alexander saw Nurse Shuman again on February 15, 2023, when Mr. Alexander told him that he participated in physical therapy with no improvement and that he could not bend his finger past a certain point. Dkt. 65-2 at 38-40. In response, Nurse Shuman referred Mr. Alexander to the provider and instructed him to request a sick call if his symptoms did not subside or became worse. *Id*. On March 26 when Nurse Shuman saw Mr. Alexander in response to a HCRF complaining that his hand hurt and was not working but felt better during physical therapy, Nurse Shuman referred Mr. Alexander to the provider and instructed him to apply ice and cool compresses and heat as needed. *Id.* at 25-27, 102.

The Court finds that Nurse Shuman is entitled to summary judgment. Nurse Shuman cleaned Mr. Alexander's wounds, provided care instruction, and gave him advice on how to relieve his pain. He used his professional medical judgment by elevating his concerns regarding Mr. Alexander's symptoms to the provider when necessary. No reasonable jury could conclude that Nurse Shuman's conduct during these four visits evinced deliberate indifference. Nurse Shuman is entitled to summary judgment.

### C. Nurse Ojile

On summary judgment, Nurse Ojile argues that she was not deliberately indifferent to Mr. Alexander's medical needs; rather, the treatment she gave was reasonable and in accordance with the standard of care. Dkt. 85 at 6.

Nurse Ojile is entitled to summary judgment. The evidentiary record reflects that Nurse Ojile saw Mr. Alexander a handful of times for dressing changes in October 2022 and a sick visit in December 2022. Dkt. 65-1 at 48-49; 60-65. At the first dressing change, when Mr. Alexander's surgical site remained swollen with no drainage, Nurse Ojile contacted Dr. Heflin, who prescribed Amoxicillin. Dkt. 65-2 at 61-63.

Dr. Heflin determined that Amoxicillin was an appropriate antibiotic choice to treat a suspected developing infection in the area of Mr. Alexander's surgical incision wound. Dkt. 65-1 at 2-3. Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Rather, Mr. Alexander "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728.

Nurse Ojile did not disregard a substantial risk of harm by contacting a provider who had the authority to prescribe, and did prescribe, Amoxicillin due to Mr. Alexander's swelling. During each of the October dressing changes, Nurse Ojile cleaned and bandaged Mr. Alexander's wound

and observed no signs of infection. *Id.* The evidence does indicate that Mr. Alexander refused a dressing change on October 18 and likewise refused to sign the refusal form. Dkt. 65-2 at 60; Dkt. 84-1 at 2. But Mr. Alexander's choice to refuse a dressing change has no bearing on whether Nurse Ojile was deliberately indifferent to his medical needs. Rather, Nurse Ojile exercised medical judgment and responded appropriately in treating Mr. Alexander's medical needs.

Accordingly, Nurse Ojile is entitled to summary judgment.

### IV.    CONCLUSION

For the reasons explained in this Order, the Defendants' Motions For Summary Judgment are **GRANTED**. Dkts. [64], [84]. The **clerk is directed** to terminate Defendants Shuman, Ojile, and Heflin from the docket. No partial final judgment will issue.

Defendant Mukona did not move for summary judgment, so the claims against him must be resolved by settlement or trial. The magistrate judge shall set this case for a telephonic status conference to discuss the status of settlement and trial readiness.

The **clerk is directed** to correct the spelling of this Defendant's name from Adonia Mykona to Adoniah Mukona. *See* Dkt. 81.

**IT IS SO ORDERED.**

Date: 3/11/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

RYAN ALEXANDER
282841
PLAINFIELD CORRECTIONAL FACILITY
Inmate Mail/Parcels
727 MOON ROAD
PLAINFIELD, IN 46168

All Electronically Registered Counsel

Magistrate Judge M. Kendra Klump